**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **BUCCANEER RESOURCES, LLC, *et al.*,**[1] | § | **Case Nos. 14-60041 (DRJ)** |
| | § | **(Chapter 11)** |
| | § | |
| **Debtors.** | § | **Jointly Administered** |
| | § | |
| | § | |
| **J.A. COMPTON, TRUSTEE OF THE BUCCANEER CREDITORS' LIQUIDATING TRUST,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **Adversary No. 16-06006** |
| | § | |
| **KENAI OFFSHORE VENTURES, LLC AND TERAS INVESTMENTS PTE. LTD.,** | § | |
| | § | |
| **Defendants.** | § | |

**FIRST AMENDED COMPLAINT TO AVOID AND RECOVER PREFERENTIAL TRANSFERS PURSUANT TO 11 U.S.C. §§ 544, 547, 548 AND 550**

J.A. Compton, as the Trustee of the Buccaneer Creditors' Liquidating Trust (the "Trustee"), files this First Amended Complaint to Avoid and Recover Preferential Transfers Pursuant to 11 U.S.C. §§ 544, 547, 548 and 550 against Kenai Offshore Ventures, LLC and Teras Investments Pte. Ltd. (collectively, the "Defendants"), and alleges as follows:

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: (i) Buccaneer Energy Ltd. (0107); (ii) Buccaneer Energy Holdings, Inc. (7170); (iii) Buccaneer Alaska Operations, LLC (7562); (iv) Buccaneer Resources, LLC (8320); (v) Buccaneer Alaska, LLC (4082); (vi) Kenai Land Ventures, LLC (2661); (vii) Buccaneer Alaska Drilling, LLC (7781); (viii) Buccaneer Royalties, LLC (5015); and (ix) Kenai Drilling, LLC (6370) ("Debtors").

**I.**
**Introduction**

1. This adversary proceeding against Defendants is brought under FED. R. BANKR. P. 7001. By this adversary proceeding, the Trustee seeks to avoid and recover, pursuant to sections 544, 547, 548 and 550 of the Bankruptcy Code, preferential and fraudulent transfers that Debtors made to Defendants.

**II.**
**Jurisdiction and Venue**

2. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157 (b)(2)(F). Venue of this adversary proceeding is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

**III.**
**Parties**

3. The Plaintiff is J.A. Compton, the Trustee for the Buccaneer Creditors' Liquidating Trust, which was formed and authorized by the Confirmed Plan (hereinafter defined) in the above-referenced Chapter 11 Bankruptcy Case of *In re Buccaneer Resources, LLC, et al.*, Bankruptcy Case No. 14-60041 (the "Bankruptcy Case").

4. Defendant, Kenai Offshore Ventures, LLC ("KOV") is a limited liability company that is registered with the Alaska Department of Commerce. Defendant, Kenai Offshore Ventures, LLC may be served with process pursuant to FED R. BANKR. P. 7004(b) by serving a copy of this Complaint and the Summons on Defendant's Registered Agent, CT Corporation System, at its Registered Office, 9360 Glacier Highway, Suite 202, Juneau, AK 99801. KOV has consented to the Bankruptcy Court's jurisdiction by filing numerous Proofs of Claims in the Debtors' bankruptcy cases. KOV has filed the following Proofs of Claims: (1) Proof of Claim No. 119 in

Case No. 14-60041 (Buccaneer Resources, LLC); (2) Proof of Claim No. 8 in Case No. 14-60042 (Buccaneer Energy Ltd.); (3) Proof of Claim No. 29 in Case No. 14-60042 (Buccaneer Energy Ltd.); (4) Proof of Claim No. 5 in Case No. 14-60047 (Buccaneer Alaska Drilling, LLC); (5) Proof of Claim No. 14 in Case No. 14-60047 (Buccaneer Alaska Drilling, LLC); (6) Proof of Claim No. 16 in Case No. 14-60047 (Buccaneer Alaska Drilling, LLC); (7) Proof of Claim No. 4 in Case No. 14-60049 (Kenai Drilling LLC); and (8) Proof of Claim No. 11 in Case No. 14-60049 (Kenai Drilling LLC).

5.     Defendant, Teras Investments Pte. Ltd. ("Teras Investments") is a Singapore entity. Defendant, Teras Investments Pte. Ltd. may be served with process pursuant to FED R. BANKR. P. 7004(b) and under the Hague Convention by serving a copy of this Complaint and the Summons by Federal Express to the Defendant, c/o Cheah Boon Pin, 15 Hoe Chiang Road, # 12-05 Tower Fifteen, Singapore 089316.   Teras Investments has consented to the Bankruptcy Court's jurisdiction by filing Proof of Claim No. 17 in Case No. 14-60047 (Buccaneer Alaska Drilling LLC).  In addition, this court has personal jurisdiction over Teras Investments.  The claims and causes of action arise out of Teras Investments' ownership of a fifty percent (50%) membership interest in KOV, a Delaware limited liability company, with its principal place of business in Alaska.  KOV's most significant asset is an offshore jack-up rig named the "Endeavour – Spirit of Independence" (the "Endeavour").  Teras Investments obtained its fifty percent (50%) membership interest in KOV through the Membership Interest Purchase Agreement by and between Buccaneer Alaska Drilling LLC and Teras Investments.  At the time the Membership Interest Purchase Agreement was executed, the Endeavour was located in Alaska.  The Membership Interest Purchase Agreement conveyed Buccaneer Alaska Drilling, LLC's membership interest in KOV to Teras Investments.

## IV.
## Background

6. On May 31, 2014 (the "Petition Date"), (a) Buccaneer Energy Ltd., (b) Buccaneer Energy Holdings, Inc., (c) Buccaneer Alaska Operations, LLC, (d) Buccaneer Resources, LLC, (e) Buccaneer Alaska, LLC, (f) Kenai Land Ventures, LLC, (g) Buccaneer Alaska Drilling, LLC, (h) Buccaneer Royalties, LLC, and (i) Kenai Drilling, LLC (collectively "Buccaneer" or "Debtors") filed voluntary petitions for relief in the United States Bankruptcy Court for the Southern District of Texas under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

7. As of the time of Buccaneer's bankruptcy filings, Buccaneer was engaged in the exploration for, and acquisition, production, and sale of, crude oil and natural gas. Buccaneer leased and/or operated numerous oil and gas wells and properties, and held working interests in numerous wells in various portions of Texas and Alaska.

8. On January 13, 2015, the Bankruptcy Court entered an Order Confirming the First Amended Joint Chapter 11 Plan (Docket No. 591) (the Order Confirming the First Amended Joint Chapter 11 Plan is hereafter referred to as the "Confirmation Order" and the First Amended Joint Chapter 11 Plan, as amended, modified, and/or supplemented, is hereafter referred to as the "Confirmed Plan"). Pursuant to the Confirmed Plan, the Trustee is empowered to prosecute, litigate and settle any causes of action arising against the Defendants under sections 544, 547, 548 and 550 of the Bankruptcy Code.

## Buccaneer's Background

9. Buccaneer consists of nine (9) affiliated companies involved in the exploration for and production of oil and natural gas in North America, primarily in Texas and Alaska, and include the following:

- Buccaneer Energy Limited ("BCC") - The ultimate parent company of the nine (9) affiliated companies is BCC, which was a publicly traded, independent oil and gas company founded in 2006 and was listed on the Australian Securities Exchange (the "ASX") under the symbol "BCC." While BCC was an Australian listed entity, BCC operated exclusively through its eight (8) U.S. subsidiaries located primarily in Texas (Houston) and Alaska (Kenai, Anchorage and Soldotna).

- Buccaneer Resources, LLC ("BUC") - BUC, formed in 2006, is a Texas limited liability company based in Houston, Texas. BUC operated as an upstream oil and gas company specializing in the development and expansion of behind-pipe proved and probable reserves, and low-risk exploration plays with growth potential. BUC owns all of Buccaneer's interests in oil and gas leaseholds in Texas, which, with one exception, were non-producing as of the date the confirmed plan's disclosure statement was filed.

- Buccaneer Alaska, LLC ("BAK") - BAK is a Texas limited liability company based in Houston, Texas. BAK owned all of Buccaneer's interest in oil and gas leaseholds in Alaska, including oil and gas wells in the Alaskan Cook Inlet.

- Buccaneer Alaska Drilling, LLC ("BAD") - BAD, formed in 2010, was an Alaska limited liability company and the sole member of Kenai Drilling. BAD also held a fifty percent (50%) membership interest in KOV.

- Kenai Drilling, LLC ("Kenai Drilling") - Kenai Drilling, established in 2012, is an Alaskan limited liability company that managed drilling operations for Buccaneer in the Alaskan Cook Inlet. Kenai Drilling was also the charterer of the Endeavour pursuant to the Bareboat Charter (defined below).

- Kenai Land Ventures, LLC ("Kenai Land") - Kenai Land f/k/a Buccaneer Offshore Operations, LLC, is an Alaskan limited liability company formed in 2011 to acquire rights in a certain onshore drilling rig named the Glacier Drilling Rig #1 (the "Glacier Rig").

## Buccaneer's History

10. Buccaneer was formed in 2006 and at that time concentrated on acquiring small prospects in the Gulf of Mexico and onshore coastal areas, which, because of their size, were not appealing to major oil companies but presented potential economic opportunity favorable to smaller companies such as Buccaneer.

## Gulf of Mexico & Texas Operations

11. In 2008, when natural gas prices were more than $10 per MCF, Buccaneer, through its BUC subsidiary, acquired several offshore assets in the shallow Gulf of Mexico

between Texas and Louisiana. BUC's offshore prospect, sixty-five percent (65%) working interest in the Pompano field, is located approximately seven miles offshore in the Gulf of Mexico and approximately 28 miles east of Port O'Connor, Texas. BUC spudded its first well in the Pompano field on January 12, 2008 and its second well on February 24, 2008. While the project has existing production facilities in place, as of November 2014, all wells in the Pompano field were shut-in, and all of BUC's leases in the Pompano field have expired.

12. Also in 2008, Buccaneer acquired assets in the Eagle Ford Shale under the Austin Chalk in Lee County, Texas. As of November 2014, of the two (2) onshore working interests BUC acquired in Texas, the "Alexander Unit" in Lee County, Texas was the only remaining active unit. However, as of November 2014, the Alexander Unit was not producing in paying quantities.

**Alaskan Operations**

13. In 2008, when the meltdown in financial markets significantly and negatively impacted Buccaneer's ability to raise funds to develop its Gulf Coast assets, Buccaneer turned its focus to Alaska – specifically, the Cook Inlet basin, the second largest production area for oil and gas in the State of Alaska. In addition to its production potential, Buccaneer sought to take advantage of Alaska's Clear and Equitable Share ("ACES") program, which was designed specifically to develop and promote drilling activity in many of Alaska's undeveloped or underdeveloped locations, such as the Cook Inlet. The ACES program provides companies with incentives to develop existing resources in the area by offering a cash rebate of up to sixty-five percent (65%) of all monies spent on exploration, drilling and building production facilities, and up to forty-five percent (45%) of facilities-related capital expenditures, such as on platforms, flow-lines and pipelines. The incentives under the ACES apply irrespective of the success of any well or development program.

14. Buccaneer began its Alaskan program in March 2010, when BAK acquired 70,000 acres of onshore and offshore leases in the Cook Inlet. With this acquisition, BAK became the sixth largest lease holder in the Cook Inlet and began an exploration and development program with both onshore and offshore components, beginning with the acquisition of 9,308 acres at the Kenai Loop Project through leasing agreements with the Alaska Mental Health Land Trust ("MHLT"), the State of Alaska and Cook Inlet Region Inc. ("CIRI").

15. Upon acquiring an interest in the Kenai Loop Project, BAK, through use of the Glacier Rig, drilled the Kenai Loop No. 1-1 discovery well in April 2011, and began its first commercial production in January 2012. BAK subsequently drilled three (3) additional wells in the Kenai Loop field, one producing well, one dry hole, and one well that was completed and tested but shut-in pending the resolution of a lease dispute with CIRI. The Kenai Loop No. 1-1 entered into full production in late February 2012 and the Kenai Loop No. 1-3 well commenced production in February 2013. In May 2012, through a rig charter agreement executed by Kenai Land, Buccaneer secured exclusive leasing rights for the Glacier Rig for a period of three (3) years through May 2015.

**Kenai Offshore Ventures LLC and the Endeavour Offshore Jack Up Rig**

16. As part of their pre-bankruptcy strategy, Buccaneer sought to acquire an offshore jack-up rig to execute on Buccaneer's offshore program in Cook Inlet and other Alaska Outer Continental Shelf waters. As a result, on November 3, 2010, BAD organized KOV. The purpose of KOV was to acquire and own the offshore jack-up rig named the Endeavour.

17. To obtain the necessary capital to acquire the Endeavour, Ezion Holdings Limited ("Ezion") was added as a member to KOV on April 14, 2011. BAD owned fifty percent (50%) of

the membership interest in KOV and Ezion held the remaining fifty percent (50%) of the membership interest in KOV. KOV owned the Endeavour.

18. At all relevant times, KOV was a member-managed, Delaware limited liability company. However, certain limited power and authority specifically enumerated in the First Amended and Restated Limited Liability Company Agreement of Kenai Offshore Ventures, LLC ("KOV Company Agreement") was delegated to the Manager. BAD was appointed the Manager of KOV. BAD's authority as Manager of KOV included KOV's day-to-day operations and affairs.

19. While KOV would own the Endeavour, the Debtor, Kenai Drilling, a wholly-owned subsidiary of BAD, would serve as operator and maintain control of the Endeavor through a Bareboat Charter. KOV entered into a long term Bareboat Charter Agreement ("Charter") dated November 3, 2011 with Kenai Drilling. Attached hereto as **Exhibit B** is the Bareboat Charter Agreement. Pursuant to the Charter, Kenai Drilling would serve as operator and maintain control of the Endeavour. The initial term of the Charter was for five (5) years, during which time Kenai Drilling was required to make monthly payments to KOV, pursuant to a day rate of approximately $70,000.00, for exclusive use of the Endeavour.

20. Upon acquiring the Endeavour in November 2011, and because the Endeavour had been idle for several years, Buccaneer, Ezion and KOV deemed it necessary to complete extensive upgrades and repairs to ensure that the Endeavour was ready for safe, long term operations in Alaska. The Endeavour was dry docked at a shipyard in Singapore for six (6) months undergoing repairs and upgrades. Those repairs and upgrades continued at the Homer Deep Water Dock in Homer, Alaska when the rig arrived in the Cook Inlet in August 2012. Upon the Endeavor's arrival in Homer in August 2012, KOV worked with local contractors through the Endeavour's project manager, Archer Drilling, LLC ("Archer").

**Cosmopolitan Project**

21.    Buccaneer believed that the acquisition of the Cosmopolitan project located in the southern part of the Cook Inlet would allow the use of the Endeavour to provide a more efficient development plan than was previously available. Without access to a jack-up rig such as the Endeavour, all wells in the Cosmopolitan project would need to be drilled as long-reach directional wells from onshore. Buccaneer believed that utilization of the Endeavour materially improved the economic parameters of the overall Cosmopolitan project.  Due to the location of the Cosmopolitan project in the southern part of the Cook Inlet, it would provide a winter operational location for the Endeavour when ice flows in the northern part of the Cook Inlet preclude drilling.

22.    Beginning in mid-2013 and continuing in 2014, Buccaneer undertook multiple initiatives to reduce debt and improve its balance sheet. As part of its recapitalization initiative, Buccaneer refinanced its existing debt facilities with Victory Park Capital ("Victory Park") in January 2014, with the assignment of the $100 million Victory Park Facility (defined below) to Meridian Capital CIS Fund, an affiliate of Meridian Capital International Fund (collectively, "Meridian"), on amended terms.

23.    In addition to this refinancing, Buccaneer embarked on a series of asset sales designed to generate additional working capital. On January 24, 2014, Buccaneer sold its interest in the Cosmopolitan project to BlueCrest for a total consideration of $40.6 million.

24.    Furthermore, due to the various issues associated with the mobilization of the Endeavour and related issues tied to the Archer litigation described below, the Endeavour had not been fully utilized, and day rate charges continued to accrue while the Endeavour remained idle at Port Graham in the Kenai Peninsula.   Kenai Drilling and the Debtors were unable to make the monthly charter payments.

25.     As noted above, Buccaneer's operations in Texas, Louisiana and the Gulf of Mexico resulted in the expenditure of considerable capital with no resulting production of oil or gas in paying quantities.  Buccaneer also spent more than $100 million to develop its Alaskan onshore and offshore program.   Although Buccaneer acquired substantial oil and gas reserves, only two (2) wells were producing as of November 2014, and one hundred percent (100%) of the net production proceeds were required to be escrowed pursuant to an order entered by the Alaska Oil and Gas Conservation Commission ("AOGCC") in connection with litigation with CIRI (the "Escrow Order"), which is discussed below.  Consequently, Buccaneer ran out of available working capital to repay the AIX Facility due in June 2014 or to meet its contractual obligations.

**Archer Litigation**

26.     In October 2011, KOV entered into an agreement with Archer under which Archer was to provide project management services for modifications and repairs to the Endeavour.  Under this agreement, Archer was responsible for managing the modifications and repairs on the Endeavour both in Singapore and upon arrival of the Endeavour in Alaska.

27.     In December 2012, Archer filed a lawsuit in Harris County, Texas against several Buccaneer entities and KOV for approximately $6 million in unpaid invoices and also claimed additional damages (the "Archer Litigation").  Buccaneer and KOV denied all liability and lodged counterclaims against Archer for damages.

**CIRI Litigation**

28.     As described above, Buccaneer obtained interests in the Kenai Loop field through leasing agreements with the MHLT, the State of Alaska and CIRI.  Buccaneer drilled four (4) wells on the MHLT lease and placed two (2) of these wells into commercial production.

29. CIRI alleged that its lease with Buccaneer terminated in January 2013 based on an assertion that Buccaneer failed to meet various lease commitments. CIRI asserted that the Kenai Loop No. 1-4 well targeted natural gas resources on CIRI land, and thus CIRI filed an opposition with the AOGCC.

30. On October 2013, CIRI filed: (i) a lawsuit in Alaska Superior Court against Buccaneer to recover alleged losses from uncompensated gas production purportedly attributable from its land; and (ii) an administrative action with the AOGCC asking for the establishment of an escrow account funded out of Kenai Loop production to protect all of the landowners – MHLT, the State of Alaska and CIRI – until the precise geological allocation of gas attributable to each of the landowners could be sorted out.

**Membership Interest Purchase Agreement**

31. Ultimately, Kenai Drilling was unable to make the monthly payments under the Charter Agreement.

32. As a result, on December 31, 2013, pursuant to a Membership Interest Purchase Agreement ("MIPA") BAD sold to Teras Investments BAD's membership interest in KOV and all net outstanding amounts payable by KOV to BAD and/or to BAD's affiliates (the "Membership Interest Transfer"). A true and correct copy of the MIPA is attached hereto as **Exhibit A**. Teras Investments is a wholly-owned subsidiary of Ezion, the other fifty percent (50%) owner of KOV.

33. The stated purchase price for BAD's membership interest in KOV was TWENTY-THREE MILLION NINE HUNDRED FIFTY AND NO/100 DOLLARS ($23,950,000.00) (the "Purchase Price"), however, no net cash proceeds flowed to BAD or any Debtor from this transaction. Instead of providing BAD and Buccaneer with the Purchase Price, the Purchase Price was used solely to pay the Defendants' debts as follows:

a. $11,222,441.00 to Teras Investments in full satisfaction of the Unsecured Loan Agreement dated January 22, 2013, by and between Asset Advant Limited, Pacific Hill International Limited, Harbour Sun Enterprises and BAD which was assigned to Teras Investments in November 2013.

b. $1,800,645.00 to Teras Investments in satisfaction of all outstanding Guarantee Fee amounts owed by BAD to Teras Investments.  Teras Investments provided a corporate guarantee in favor of Overseas Chinese Banking Corporation, Ltd. ("OCBC") to secure the Term Loan and Security Agreement dated December 22, 2013.

c. $989,645.01 to Teras Investments in satisfaction of lease rentals from August 2012 through November 2012 and late payment interest due under a Drilling Rig Lease Agreement dated May 17, 2012, by and between Teras Oilfield Support Limited and Kenai Land Ventures, LLC.

d. $2,815,915.80 to KOV in satisfaction of outstanding charter fees and interest due under the Charter for the months of April 2013, May 2013 and June 2013.

e. $5,282,697.47 to KOV in satisfaction of outstanding charter fees and interest due under the Charter for the months of October 2013, November 2013 and December 2013.

f. $1,838,655.98 to KOV as repayment of the non-refundable advance payment of the Charter Hire.

34.     The above will be collectively referred to as the "Purchase Price Transfers". The MIPA also provided:

g. An $800,000.00 receivable owed by BAD to KOV was used to partially satisfy a $1,750,000.00 Maintenance Service Contract Fee owed by KOV to BAD, reducing the outstanding Maintenance Service Contract Fee owed by KOV to BAD to $950,000.00.

h. The remaining $950,000.00 Maintenance Service Contract Fee owed by KOV to BAD was credited by KOV against an Advance Charter Payment owed by Kenai Drilling to KOV.

The above will be collectively referred to as the "Maintenance Service Fee Transfers".

35.     BAD and Buccaneer did not receive any cash from this transaction.  The transaction removed substantial assets, the KOV membership interest and a $1,750,000.00 account receivable, while still leaving Kenai Drilling, BAD and KLV responsible for fees that would continue to

accrue under the Bareboat Charter and Drilling Rig Lease Agreement. BAD, Kenai Drilling, KLV and Buccaneer were not able to pay their obligations, including operational debts, as they came due any more than they were able to before the transaction. This transaction did not benefit anyone except KOV and Teras.

36. At the time the MIPA was entered into, the Endeavour had substantial value. In addition to the consideration provided in the MIPA, KOV made an additional payment of $25.7 million to the Alaska Industrial Development and Export Authority ("AIDEA") to buy out AIDEA's preferred membership interest. While AIDEA was a preferred member, the Endeavour had to remain in Alaska. KOV's and Teras Investments' buyouts of BAD and AIDEA allowed KOV to move the Endeavour from Alaska to another location that was more profitable.

37. In addition, at the time the MIPA was entered into, BAD, Kenai Drilling and the remaining Debtors owed millions in account payables to numerous vendors and creditors, including Archer, who had already brought suit against Buccaneer and KOV.

**After December 31, 2013, Buccaneer's Financial Condition Continues to Decline**

38. The day rate charges continued to accrue at over $70,000.00 per day under the Charter. Kenai Drilling could still not pay the day rate charges. This resulted in Kenai Drilling receiving a payment default notice from KOV on May 8, 2014 demanding that $6,520,289.00 be paid immediately. Kenai Drilling was unable to pay this amount and was unable to pay the day rate charges on a go-forward basis with no ongoing drilling operations in which to utilize the Endeavour.

39. On May 22, 2014, the AOGCC issued a decision in the CISPRI Litigation ordering, in part, that Buccaneer escrow one hundred percent (100%) of its production revenues from the

Kenai Loop wells beginning June 10, 2014, until such time as an allocation of gas attributable to each of the adjacent landowners is made, or upon further order by the AOGCC.

**Buccaneer's Financial Condition**

40. Since at least 2009, Buccaneer has reported net losses ranging from an Australian $3.7 million loss in 2010 to an Australian $22.2 million loss in 2013. Furthermore, Buccaneer also generated negative cash flows from operations four (4) out of five (5) years with 2009 being the only fiscal year that Buccaneer generated positive cash flows. From 2010 through 2013, Buccaneer's cash flows from operations ranged from negative Australian $1.7 million in 2011 to negative Australian $11.4 million in 2012.

41. These negative earnings and cash flows are the result of Buccaneer investing in oil and gas assets it planned on developing and monetizing. However, the wells that were being drilled were either non-producing or were producing in limited quantities. In a December 2013 compliance certificate, Buccaneer provided Victory Park the December 2013 forecast. Buccaneer projected that its cash flow from operations from December 2013 through November 2014 would result in a net cash deficit of approximately $103.2 million.

42. As of December 31, 2013 and continuing through the Petition Date, Buccaneer, collectively, and BAD and Kenai Drilling, individually, were insolvent on a balance sheet, cash flow and adequate capital basis. On December 31, 2013, the liabilities of Buccaneer, collectively, and BAD and Kenai Drilling, individually, exceeded the fair value of their respective assets on both a going concern and liquidation basis. As evidenced by Buccaneer's negative cash flow and its inability to pay numerous debts, including but not limited to Kenai Drilling's failure to pay the day rate charges under the Charter, and Buccaneer's inability to pay millions owed to numerous

vendors and creditors, Buccaneer, Kenai Drilling and BAD could not pay debts as they became due.

43. Finally, Buccaneer did not have available working capital to repay its contractual obligations. Buccaneer projected a deficit from its cash flows and there were no additional sources of financing available to Buccaneer. As a result, Buccaneer's capital was unreasonably small as of December 31, 2013 and continuing through the Petition Date and Buccaneer did not have the ability to generate sufficient cash flows to sustain its operations going forward.

**V.**
**Count 1: Avoidance of Preferential Transfers – 11 U.S.C. § 547**

44. The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

**A. The Purchase Price Transfers were made on or within one (1) year before the Petition Date.**

45. On or within one (1) year prior to the Petition Date, that is, from June 1, 2013 through and including May 31, 2014 (the "Preference Period"), BAD made the Purchase Price Transfers (collectively, the "Transfers") to one or both of Teras Investments and KOV.

**B. Teras Investments and KOV are Insiders of BAD.**

46. Insiders include: (i) a director of the debtor; (ii) an officer of the debtor; (iii) a person in control of the debtor; (iv) a partnership in which the debtor is a general partner; (v) a general partner of the debtor; and (vi) an affiliate, or insider of an affiliate as if such affiliate were the debtor. Affiliates include a person whose business is operated under a lease or operating agreement by a debtor, or person, substantially all of whose property is operated under an operating agreement with the debtor.

47. BAD was the managing member of KOV. KOV's day-to-day business was operated by BAD under KOV's First Amended Company Agreement. In addition, KOV's major

asset is the Endeavour.  At the time the Purchase Price Transfers were made, the Endeavour was chartered to Debtor, Kenai Drilling, who conducted day-to-day operations of the Endeavour and maintained control of the Endeavour.  As such, KOV was both an affiliate and insider of BAD and Kenai Drilling.

48.     Teras Investments is a member of KOV.  As such, Teras Investments is an insider of KOV.  Since KOV is an affiliate of BAD and Kenai Drilling, Teras Investments is an insider of an affiliate and, as such, is an insider of BAD and Kenai Drilling.

**C.     The Purchase Price Transfers were Transfers of an Interest in Debtors' Property.**

49.     BAD owned fifty percent (50%) of the membership interest in KOV.  Had the Membership Interest Transfer not occurred, KOV's fifty percent (50%) membership interest in KOV would have been part of Debtors' bankruptcy estate at the Petition Date.

50.     Upon making the Membership Interest Transfer, BAD was owed the Purchase Price.  Had the Purchase Price Transfers not occurred, the Purchase Price would have been part of Debtors' bankruptcy estate at the Petition Date.   Therefore, the Purchase Price Transfers constituted transfers of an interest of property of Debtors.

**D.     The Purchase Price Transfers were made to or for the Benefit of a Creditor.**

51.     KOV and Teras Investments were creditors of one or more of the Debtors. Specifically, Teras Investments was a creditor of the Debtors with respect to the following:

    a.  the Unsecured Loan Agreement dated January 22, 2013, by and between Asset Advant Limited, Pacific Hill International Limited, Harbour Sun Enterprises and BAD, which was assigned to Teras Investments in November 2013;

    b.  outstanding Guarantee Fee amounts owed by BAD to Teras Investments whereby Teras Investments provided a corporate guarantee in favor of Overseas Chinese Banking Corporation, Ltd. to secure the Term Loan and Security Agreement dated December 22, 2013; and

      c.   lease rental payments and late payment interest due under a Drilling Rig Lease Agreement dated May 17, 2012.

52.     KOV was a creditor of the Debtors with respect to the following:

      a.   outstanding charter fees and interest due under the Charter;

      b.   fees owed to KOV as repayment of the non-refundable advance payment of the charter hire;

      c.   an $800,000.00 receivable owed by BAD to KOV.

53.     The Purchase Price Transfers were made, or caused to be made, to or for the benefit of one or both of KOV and Teras Investments.  Since KOV and Teras Investments were creditors, the Purchase Price Transfers were made to or for the benefit of a creditor.

**E.      The Purchase Price Transfers were made for or on account of an Antecedent Debt owed by a Debtor to Defendants.**

54.     Each of the Purchase Price Transfers was made, or caused to be made, for or on account of an antecedent debt owed by one or more of the Debtors to KOV and Teras Investments. In each instance the Purchase Price Transfers were in satisfaction of or on account of loans and debts for which one or more of the Debtors owed one or both of the Defendants at the time each Purchase Price Transfer was made.  Thus, each Purchase Price Transfer was made, or caused to be made, for or on account of an antecedent debt owed by one or more of the Debtors to the Defendants.

**F.      Debtors were Insolvent at the time each Purchase Price Transfer was made.**

55.     At the time the MIPA was entered into and the Purchase Price Transfers made, the Debtors were insolvent within the meaning of Section 101(32) of the Bankruptcy Code.  Debtors' debts far exceeded the fair value of their assets.  In addition, the Debtors' Summary of Schedules lists debts far in excess of their assets.  The MIPA was entered into because the Debtors could no longer make payments to KOV under the charter agreement.

**G. The Purchase Price Transfers enabled Defendants to receive more than they would have received if the case were a case under Chapter 7, the Purchase Price Transfers had not been made, and Defendants received payment of such debt to the extent provided by the Bankruptcy Code.**

56. If the Purchase Price Transfers had not been made, KOV and Teras Investments would have had an unsecured claim in the amount of the Purchase Price Transfers against Debtors.

57. In this case, the unsecured creditors, such as KOV and Teras Investments, did not receive a dividend equal to one hundred percent (100%) of their allowed claims. Under a hypothetical Chapter 7 case, the unsecured creditors would have received less than they are receiving under the Confirmed Plan. The Disclosure Statement for the Confirmed Plan stated that if the Debtors were liquidated under Chapter 7, the unsecured creditors would have received less than they would under the Confirmed Plan. In all cases where unsecured creditors would not receive a dividend equal to one hundred percent (100%) of their allowed claims, 11 U.S.C. § 547(b)(5) is satisfied.

58. Pursuant to section 547(b) of the Bankruptcy Code, the Trustee may avoid the Purchase Price Transfers.

59. The Trustee is entitled to avoid the Purchase Price Transfers pursuant to section 547 of the Bankruptcy Code. Defendants were the initial transferee of the Purchase Price Transfers and were the persons for whose benefit the Purchase Price Transfers were made. Accordingly, the Trustee is entitled to recover the Purchase Price Transfers in the amount of TWENTY-THREE MILLION NINE HUNDRED FIFTY AND NO/100 DOLLARS (<u>$23,950,000.00</u>), plus costs and interest thereon to the date of payment.

**VI.**
**Count 2: Avoidance of Preferential Transfers – 11 U.S.C. § 547[2]**

60. The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

**A. The Membership Interest Transfer and Maintenance Service Fee Transfers were made on or within one (1) year before the Petition Date.**

61. On or within one (1) year prior to the Petition Date, that is, from June 1, 2013 through and including May 31, 2014 (the "Preference Period"), BAD made the Membership Interest Transfer and Maintenance Service Fee Transfers to one or both of Teras Investments and KOV.

**B. Teras Investments and KOV are Insiders of BAD**

62. Insiders include: (i) a director of the debtor; (ii) an officer of the debtor; (iii) a person in control of the debtor; (iv) a partnership in which the debtor is a general partner; (v) a general partner of the debtor; and (vi) an affiliate, or insider of an affiliate as if such affiliate were the debtor. Affiliates include a person whose business is operated under a lease or operating agreement by a debtor, or a person substantially all of whose property is operated under an operating agreement with the debtor.

63. BAD was the managing member of KOV. KOV's day-to-day business was operated by BAD under KOV's First Amended Company Agreement. In addition, KOV's major asset is the Endeavour. At the time the Membership Interest Transfer and Maintenance Service Fee Transfers were made, the Endeavour was chartered to Debtor, Kenai Drilling, who conducted

[2] Trustee alleges that the Membership Interest Transfer and Maintenance Service Fee Transfers are Preferential under 11 U.S.C. §547. Trustee understands that the Court dismissed these claims and causes of action pursuant to Doc No. 24. Trustee continues to assert these causes of action solely for purpose of preserving Trustee's rights to appeal the Court's Order on Kenai Offshore Ventures, LLC and Teras Investments PTE. Ltd.'s Motion to Dismiss Trustee's Complaint [Doc No. 24].

day-to-day operations of the Endeavour.  As such, KOV was both an affiliate and insider of BAD and Kenai Drilling.

64.     Teras Investments is a member of KOV.  As such, Teras Investments is an insider of KOV.  Since KOV is an affiliate of BAD and Kenai Drilling, Teras Investments is an insider of an affiliate and, as such, is an insider of BAD and Kenai Drilling.

**C.      The Membership Interest Transfer and Maintenance Service Fee Transfers were transfers of an interest in Debtors' Property.**

65.     BAD owned fifty percent (50%) of the membership interest in KOV.  Had the Membership Interest Transfer not occurred, KOV's fifty percent (50%) membership interest in KOV would have been part of Debtors' bankruptcy estate at the Petition Date.  Therefore, the Membership Interest Transfer constituted a transfer of an interest of property of Debtors.

66.     BAD owned a receivable in the amount of $1,750,000.00, which was owed by KOV.  Had the Maintenance Service Fee Transfers not occurred, the $1,750,000.00 receivable would have been part of the Debtors' bankruptcy estate at the Petition Date.  Therefore, the Maintenance Service Fee Transfers constituted transfers of an interest of property of Debtors.

**D.      The Membership Interest Transfer and Maintenance Service Fee Transfers were made to or for the benefit of a creditor.**

67.     KOV and Teras Investments were creditors of one or more of the Debtors. Specifically, Teras Investments was a creditor of the Debtors with respect to the following:

    a.  the Unsecured Loan Agreement dated January 22, 2013, by and between Asset Advant Limited, Pacific Hill International Limited, Harbour Sun Enterprises and BAD, which was assigned to Teras Investments in November 2013;

    b.  outstanding Guarantee Fee amounts owed by BAD to Teras Investments whereby Teras Investments provided a corporate guarantee in favor of Overseas Chinese Banking Corporation, Ltd. to secure the Term Loan and Security Agreement dated December 22, 2013; and

     c. lease rental payments and late payment interest due under a Drilling Rig Lease Agreement dated May 17, 2012.

68. KOV was a creditor of the Debtors with respect to the following:

a. outstanding charter fees and interest due under the Charter;

b. fees owed to KOV as repayment of the non-refundable advance payment of the charter hire;

c. an $800,000.00 receivable owed by BAD to KOV.

69. The Membership Interest Transfer and Maintenance Service Fee Transfers were made, or caused to be made, to or for the benefit of one or both of KOV and Teras Investments. Since KOV and Teras Investments were creditors, the Membership Interest Transfer and Maintenance Service Fee Transfers were made to or for the benefit of a creditor.

**E. The Membership Interest Transfer and Maintenance Service Fee Transfers were made for or on account of an antecedent debt owed by a Debtor to Defendants.**

70. Each of the Membership Interest Transfer and Maintenance Service Fee Transfers were made, or caused to be made, for or on account of an antecedent debt owed by one or more of the Debtors to KOV and Teras Investments. In each instance the Membership Interest Transfer and Maintenance Service Fee Transfers were in satisfaction of or on account of loans and debts for which one or more of the Debtors owed one or both of the Defendants at the time each Membership Interest Transfer and Maintenance Service Fee Transfer was made. Thus, each Membership Interest Transfer and Maintenance Service Fee Transfer was made, or caused to be made, for or on account of an antecedent debt owed by one or more of the Debtors to the Defendants.

**F.      Debtors were insolvent at the time each Membership Interest Transfer and Maintenance Service Fee Transfer was made.**

71.      At the time the MIPA was entered into and the Membership Interest Transfer and Maintenance Service Fee Transfers were made, the Debtors were insolvent within the meaning of Section 101(32) of the Bankruptcy Code.  Debtors' debts far exceeded the fair value of their assets. In addition, the Debtors' Summary of Schedules lists debts far in excess of their assets.  The MIPA was entered into because the Debtors could no longer make payments to KOV under the charter agreement.

**G.      Each Membership Interest Transfer and Maintenance Service Fee Transfer enabled Defendants to receive more than they would have received if the case were a case under Chapter 7, each Membership Interest Transfer and Maintenance Service Fee Transfer had not been made, and Defendants received payment of such debt to the extent provided by the Bankruptcy Code.**

72.      If the Membership Interest Transfer and Maintenance Service Fee Transfers had not been made, KOV and Teras Investments would have had an unsecured claim in the amount of the Membership Interest Transfer and Maintenance Service Fee Transfers against Debtors.

73.      In this case, the unsecured creditors, such as KOV and Teras Investments, did not receive a dividend equal to one hundred percent (100%) of their allowed claims.  Under a hypothetical Chapter 7 case, the unsecured creditors would have received less than they are receiving under the Confirmed Plan.  The Disclosure Statement for the Confirmed Plan stated that if the Debtors were liquidated under Chapter 7, the unsecured creditors would have received less than they would under the Confirmed Plan.  In all cases where unsecured creditors would not receive a dividend equal to one hundred percent (100%) of their allowed claims, 11 U.S.C. § 547(b)(5) is satisfied.

74.      Pursuant to section 547(b) of the Bankruptcy Code, the Trustee may avoid the Membership Interest Transfer and Maintenance Service Fee Transfers.

75. The Trustee is entitled to avoid the Membership Interest Transfer and Maintenance Service Fee Transfers pursuant to section 547 of the Bankruptcy Code. Defendants were the initial transferee of the Membership Interest Transfer and Maintenance Service Fee Transfers and were the persons for whose benefit the Membership Interest Transfer and Maintenance Service Fee Transfers were made. Accordingly, the Trustee is entitled to recover the Membership Interest Transfer and Maintenance Service Fee Transfers in the amount of TWENTY-FIVE MILLION SEVEN HUNDRED THOUSAND AND 26/100 DOLLARS ($25,700,000.26), plus costs and interest thereon to the date of payment.

## VII.
## Count 3: Recovery of Fraudulent Transfers – 11 U.S.C. § 548

76. The Trustee incorporates all preceding paragraphs as if fully re-alleged herein. In the alternative, 11 U.S.C. §548 allows the Trustee to avoid and recover the Membership Interest Transfers, Purchase Price Transfers and Maintenance Service Fee Transfers (collectively, the "Transfer" or "Transfers").

77. All or part of each Transfer was a fraudulent transfer under 11 U.S.C. §§ 548(a)(1)(A) and 548 (a)(1)(B).

78. Section 548 of the Bankruptcy Code allows the Trustee to avoid and recover, for the benefit of the estate, property transferred by the Debtors within two (2) years before the Petition Date, if the Debtors made such transfer with actual intent to hinder, delay or defraud any entity to which the debtor was or became indebted or received less than reasonably equivalent value in exchange for such transfers and if the Debtors were insolvent on the date of such transfers. *See* 11 U.S.C. § 548(a).

### A. Transfers were a Transfer of an Interest of Property of Debtors

79. Each of the Transfers constitute a transfer of an interest of the Debtors in property.

80. BAD owned fifty percent (50%) of the membership interest in KOV. Had the Membership Interest Transfer not occurred, KOV's fifty percent (50%) membership interest in KOV would have been part of Debtors' bankruptcy estate at the Petition Date. Therefore, the Membership Interest Transfer constituted a transfer of an interest of property of Debtors.

81. Upon making the Membership Interest Transfer, BAD was owed the Purchase Price. Had the Purchase Price Transfers not occurred, the Purchase Price would have been part of the Debtors' bankruptcy estate at the Petition Date. Therefore, the Purchase Price Transfers constituted transfers of an interest of property of Debtors.

82. BAD owned a receivable in the amount of $1,750,000.00, which was owed by KOV. Had the Maintenance Service Fee Transfers not occurred, the $1,750,000.00 receivable would have been part of the Debtors' bankruptcy estate at the Petition Date. Therefore, the Maintenance Service Fee Transfers constituted transfers of an interest of property of Debtors.

**B. The Transfer Occurred Within Two (2) Years of The Petition Date**

83. The Transfers occurred on December 31, 2013, which is within two (2) years of the Petition Date.

**C. Transfers Made With Actual Intent to Hinder, Delay or Defraud Their Creditors.**

84. The Debtors made the Transfers with actual intent to hinder, delay or defraud their creditors. Several badges of fraud are present including, but not limited to:

- As set forth above, both KOV and Teras Investments are statutory and non-statutory insiders of BAD and the Debtors. As such, the Transfers were made to insiders.
- After the Transfers, the Debtors retained possession or control of the essential asset at issue, the Endeavour. KOV was created to own the Endeavour while Kenai Drilling was created to maintain day-to-day control of the Endeavour pursuant to

the Charter. The Endeavour was KOV's most valuable, and probably only, asset. While BAD may have transferred its membership interest in KOV, Kenai Drilling and the Debtors maintained control over the essential asset, the Endeavour, pursuant to the Charter.

- Before the MIPA was executed and the Transfers made, the Debtors had already been sued by Archer for approximately $6 million in unpaid invoices and additional damages. Likewise, the Debtors had already been sued by CISPRI whereby CISPRI was attempting to recover alleged losses from uncompensated gas production.

- As set forth above, the Debtors, collectively, and BAD, individually, were insolvent within the meaning of Section 101(32) of the Bankruptcy Code when they made the Transfers. As also set forth above, as of December 31, 2013, Debtors', collectively, and BAD's, individually, liabilities far exceeded their assets. Also, Debtors, collectively, and BAD, individually, had unreasonably small capital to engage in its business. Finally, as of December 31, 2013, Debtors and BAD intended to incur debts, or believed that the Debtors and BAD would continue to incur debts, that would be beyond the debtor's ability to pay as such debts came due.

- The transaction set forth in the MIPA was designed to permit KOV and Teras Investments to take two (2) substantial and valuable assets – the fifty percent (50%) membership interest in KOV and a $1,750,000.00 receivable – away from BAD's and the Debtors' creditors to solely benefit KOV and Teras Investments. The primary goals were to: (i) protect KOV's and Teras Investments' interest in KOV

and the Endeavour; (ii) satisfy only the Defendants' debts; and (iii) prevent KOV or Teras Investments from paying a single dollar to the Debtors.  This was not a transaction to restructure BAD's and the Debtors' debts in such a way that would allow it to operate long term.  Nor would the transaction permit other creditors of BAD and the Debtors to realize the value of the KOV membership interest or the $1,750,000.00 account receivable owed by KOV, either through pro rata distributions to all creditors, through reinvestment in operations or from future revenue derived through BAD's membership interest in KOV.  Instead, KOV and Teras Investments divested BAD and the Debtors of two (2) substantial assets while not actually paying a single dollar.

- In addition, as part of the transaction, BAD and the Debtors entered into an Estoppel and Consent Agreement with Ezion, Teras Investments and KOV.  Under the Estoppel and Consent Agreement, BAD and the Debtors were responsible for the management and control of the Archer Litigation and were responsible for paying all expenses related to the Archer Litigation, which is directly related to the goods and services provided by Archer on the Endeavour.  This was despite the fact that the Debtors and BAD would no longer realize any benefit from the KOV membership interest.

- The MIPA transaction was also set up to pay only KOV and Teras Investments, knowing that BAD and the Debtors would be left unable to operate their business or pay their debts as they became due.  At the time of the MIPA, BAD and the Debtors already owed millions to vendors and creditors.  They had already been sued by Archer for approximately $6 million and sued by CISPRI, which was

threatening to cut off Debtors' operational cash flow.  KOV, being the owner of the Endeavour, and Teras Investments, had knowledge of: (i) the various issues associated with the mobilization of the Endeavour; (ii) that the Endeavour had not been fully utilized while day rate charges continued to accrue; (iii) of the pending lawsuits by Archer and CISPRI; (iv) that BAD and the Debtors were past due on numerous debts including, but not limited to: debts owed to KOV and Teras Investments under the Charter; debts owed under lease agreement for the Glacier rig; and debts alleged to be owed to Archer.  The transaction was structured in such a manner that only KOV's and Teras Investments' debts were paid.  Nothing in this transaction provided the Debtors and BAD with any financial relief because KOV and Teras Investments were not required to actually pay a single dollar.

- After the transaction, the Debtors had the same obligations to KOV and Teras Investments that they had before the transaction, including the fees and obligations under the Charter and the lease agreement for the Glacier Rig.  In addition, the Debtors had the obligation to fully fund the costs and expenses incurred in the Archer litigation.  This was added to all of the Debtors' obligations to their remaining creditors and vendors, which was in the millions.  Despite having all the same obligations, the Debtors were left with insufficient assets to continue operations.

- The Transfers left BAD and the Debtors unable to pay its other creditors.  Prior to the transaction, it was clear that BAD and the Debtors could not pay their debts.  Rather than construct a transaction whereby BAD and the Debtors could satisfy some debts while obtaining much needed capital to continue operations, KOV and

Teras Investments divested BAD and the Debtors of the KOV membership interest and the $1,750,000.00 receivable, significant and valuable assets. This transaction did not permit BAD or the Debtors to satisfy any of its other debts or utilize the Purchase Price or the $1,750,000.00 account receivable for continuing operations.

- BAD and the Debtors did not market BAD's membership interest in KOV to any third parties. Instead, KOV, Ezion and Teras Investments forced BAD and the Debtors to enter into this transaction to protect KOV's, Ezion's and Teras Investment's interests while not paying a single dollar to BAD or the Debtors.

85.     Each of the Transfers were made with actual intent to hinder, delay and defraud Debtors' creditors.

**D.     BAD and the Debtors Did Not Receive Reasonably Equivalent Value**

86.     BAD received less than reasonably equivalent value for each of the Transfers. Before the Transfers were made, BAD had a fifty percent (50%) membership interest in KOV and a $1,750,000.00 account receivable owed by KOV. After the Transfers were made, BAD no longer held an interest in KOV and received no cash from Teras Investments and KOV for the membership interest or the account receivable. There was a complete loss of the KOV membership interest and the account receivable with no benefit whatsoever to BAD, the Debtors or their creditors, at a time in which BAD and the Debtors were insolvent.

87.     The Membership Interest Transfer and Purchase Price Transfer were made without any attempt by the Debtors or Defendants to market BAD's fifty percent (50%) membership interest in KOV. As such, the parties did not attempt to determine the fair market value of the membership interest. Instead, the parties assigned a value based upon the debts that the Debtors purportedly owed KOV, Teras Investments, and their affiliate, Teras Oilfield Support Limited, at

the time of the transaction.  This permitted KOV and Teras Investments to obtain complete ownership and control over KOV and the Endeavour while not having to pay a single dollar to BAD or the Debtors.  Had the fifty percent (50%) membership interest been properly marketed to third parties, BAD and the Debtors would have received substantially more in a sale of its KOV membership interest than the Purchase Price.  Also, at the time of the transaction, BAD and Ezion had invested millions in obtaining and refurbishing the Endeavour.  The Endeavour was newly refurbished and ready to be fully mobilized.  As such, KOV would realize, and has realized, substantial revenue and income from the Endeavour.  The transaction not only caused BAD and the Debtors to lose its membership interest in KOV, it also caused BAD and the Debtors to lose all future revenue and income streams from the fifty percent (50%) membership interest in KOV. The Purchase Price did not take into account these future revenue and income streams.  As such, the Purchase Price was substantially less than the value of BAD's membership interest in KOV and BAD and the Debtors did not receive reasonably equivalent value for the Membership Interest Transfer or the Purchase Price Transfer.

88.     The Trustee has been unable to confirm that all of the debts purportedly satisfied by the Purchase Price Transfers and Maintenance Service Fee Transfers are all legitimate debts that were due and owing with all payments and credits taken into account.  To the extent the Purchase Price Transfers and Maintenance Service Fee Transfers were used to satisfy non-existent debts or amounts that had not taken into account all payments and credits, reasonably equivalent value was not received for the Purchase Price Transfers and Maintenance Service Fee Transfers.

89.     In addition, the Transfers were made on account of debts owed by Debtors other than BAD.  Furthermore, one or more of the Transfers were made on account of debts owed to

Teras Oilfield Support Limited by Kenai Land Ventures, LLC. As such, BAD did not receive reasonably equivalent value as a result of the Transfers.

90. Defendants were the initial transferees of the Transfers and were the persons for whose benefit the Transfers were made. Accordingly, the Trustee is entitled to recover the Transfers in the amount of TWENTY-FIVE MILLION SEVEN HUNDRED THOUSAND AND 26/100 DOLLARS ($25,700,000.26), plus costs and interest thereon to the date of payment.

## VIII.
## Count 4: Recovery of Fraudulent Transfers – 11 U.S.C. § 544

91. The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

92. The Trustee is entitled to avoid the Transfers pursuant to 11 U.S.C. § 544 and ALASKA STAT. CODE §§ 34.40.010, *et seq.* Defendants were the initial transferees of the Transfers and were the persons for whose benefit the Transfers were made. Accordingly, the Trustee is entitled to recover the Transfers in the amount of TWENTY-FIVE MILLION SEVEN HUNDRED THOUSAND AND 26/100 DOLLARS ($25,700,000.26), plus costs and interest thereon to the date of payment.

93. 11 U.S.C. § 544(b)(1) provides that a "trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim…"

94. Under Alaska law:

> a conveyance or assignment, in writing or otherwise, of an estate or interest in land, or in goods, or things in action, or of rents or profits issuing from them or a charge upon land, goods, or things in action, or upon the rents or profits from them, made with the intent to hinder, delay, or defraud creditors or other persons of their lawful suits, damages, forfeitures, debts, or demands, or a bond or other evidence of debt given, action commenced, decree or judgment suffered, with the like intent, as against the person so hindered, delayed, or defrauded is void.

Alaska Stat. § 34.40.010.

95.     The Debtors made the Transfers with actual intent to hinder, delay or defraud their creditors.  Trustee hereby incorporates by reference paragraph 84 herein.

## IX.
## Count 3: Recovery of Avoided Transfers – 11 U.S.C. § 550

96.     The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

97.     Section 550 of the Bankruptcy Code allows the Trustee to recover, for the benefit of the estate, property transferred, or, if the court so orders, the value of such property from the initial transferee of such transfer or the entity for whose benefit such transfer was made.  *See* 11 U.S.C. § 550(a).  Trustee respectfully requests the Court to order that the Trustee recover the value of the property transferred to the Defendants as a result of the Transfers.  In the alternative, Trustee respectfully requests recovery of the property transferred to the Defendants as a result of the Transfers.

## X.
## Prayer

WHEREFORE, the Trustee requests entry of judgment against Defendants as follows:

i.      Declaring the Purchase Price Transfers to be preferential under section 547 of the Bankruptcy Code;

ii.     Avoiding and setting aside the Purchase Price Transfers under section 547(b) of the Bankruptcy Code;

iii.    Awarding the Trustee judgment against KOV and Teras Investments in the amount of the value of the property transferred to KOV and Teras Investments as a result of the Purchase Price Transfers and directing KOV and Teras Investments to immediately repay to Trustee such amount, pursuant to section 550 of the Bankruptcy Code;

iv.     Declaring the Membership Interest Transfer and Maintenance Service Fee Transfers to be preferential under section 547 of the Bankruptcy Code;

v.      Avoiding and setting aside the Membership Interest Transfer and Maintenance Service Fee Transfers under section 547(b) of the Bankruptcy Code;

vi. Awarding the Trustee judgment against KOV and Teras Investments in the amount of the value of the property transferred to KOV and Teras Investments as a result of the Membership Interest Transfer and Maintenance Service Fee Transfers and directing KOV and Teras Investments to immediately repay to Trustee such amount, pursuant to section 550 of the Bankruptcy Code;

vii. Declaring, the Transfers to be fraudulent under section 544 of the Bankruptcy Code and ALASKA STAT. CODE, §§ 34.40.010, *et. seq*.;

viii. Avoiding and setting aside the Transfers under section 544 of the Bankruptcy Code, and ALASKA STAT. CODE, §§ 34.40.010, *et. seq*.;

ix. Avoiding and setting aside the Transfers under section 548(a) of the Bankruptcy Code;

x. Declaring the Transfers to be fraudulent under section 548 of the Bankruptcy Code;

xi. Awarding the Trustee pre-judgment interest from the date of the Transfers at the maximum rate permitted by law;

xii. Awarding the Trustee post-judgment interest from the date of judgment until date paid at the maximum rate permitted by law;

xiii. Awarding the Trustee his costs incurred in this action; and

xiv. Granting the Trustee such other and further relief as the Court deems just and proper.

Dated: October 14, 2016

Respectfully submitted,

**SNOW SPENCE GREEN LLP**

By: */s/ Aaron M. Guerrero*
Ross Spence, SBN 18918400
ross@snowspencelaw.com
Blake Hamm, SBN 24069869
blakehamm@snowspencelaw.com
Aaron M. Guerrero, SBN 24050698
aaronguerrero@snowspencelaw.com
2929 Allen Parkway, Suite 2800
Houston, TX 77019
(713) 335-4800
(713) 335-4848 fax

**ATTORNEYS FOR J. A. COMPTON, TRUSTEE FOR THE BUCCANEER CREDITORS' LIQUIDATING TRUST**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the above and foregoing **FIRST AMENDED COMPLAINT TO AVOID AND RECOVER PREFERENTIAL TRANSFERS PURSUANT TO 11 U.S.C. §§ 544, 547, 548 AND 550** was served on this 14th day of October, 2016 on the following parties via email and Certified Mail, Return-Receipt Requested.

jmwalker@duanemorris.com
Joel M. Walker
Duane Morris LLP
600 Grant Street, Suite 5010
Pittsburgh, PA 15219

meclark@duanemorris.com
Michael E. Clark
Duane Morris LLP
1330 Post Oak Blvd., Suite 800
Houston, TX 77056

**ATTORNEYS FOR KENAI OFFSHORE VENTURES, LLC AND TERAS INVESTMENTS PTE. LTD.**

*/s/ Aaron M. Guerrero*
Aaron M. Guerrero

I:\Client\COMJ9002-Preference Actions\Adversary\Teras Investments - KOV SUIT\Pleadings\Complaint\KOV-Teras First Amended Complaint - Clean.docx